So we'll proceed to hear the first case on our day calendar. It's number 20-1342, Hinchey v. First Unum Life Insurance Co. We have Mr. Hirsonson. Good morning, Mr. Hirsonson. Good morning. May it please the court, it's my first time before this circuit. Are you Mr. Hirsonson, we're glad to have you. Thanks very much. May it please the court, the sole issue on this motion and this appeal is the utter fatigue of Mr. Hinchey on the stress test that caused him to not be able to reach the target rate, which caused the stress test to be aborted and First Unum in take that into consideration, raises issues of fact, requires the motion for summary judgment to be denied and this court should reverse the lower court and that is the issue presented on this appeal. By the way, I have a slight issue with my vocal cord. I ask the court to bear with me. It affects my voice in the morning. Of course. Thanks very much. As the court notes, the applicable ERISA regulation requires in cases of disability that the insurance company must, quote, take into account all information submitted by the claimant on the appeal. In this case, the claimant, Mr. Hinchey, submitted a letter from his cardiologist, Dr. Tartaglia, including the results of the stress test. Mr. Hersonson, I'm going to interrupt you for a minute. Before you get to the stress test and the merits, could you address the standard of review that's applicable here? First Unum retained discretion under the terms of the plan to determine eligibility. I think you've argued for de novo review, but I'm not sure about the violation of ERISA claim procedure regulation that would require de novo review. Sure. Under this court's decision, in halo, if the insurance company violates the regulation that I just quoted, then the review changes from abuse and discretion to de novo. So in this case, they failed to take into account all of the information submitted, though they did mention Dr. Tartaglia's letter of the stress test that was aborted. Unfortunately, in the very next day, they referred to, quote, the most recent cardiac stress test completed in October 2014. That was two years ago. So they made a complete mistake. Dr. Tartaglia's stress test on Mr. Hinchey was in July 2016. That was the crucial mistake made by First Unum in the appeal decision. That's why I, in my brief, made such a big deal in my brief. In their brief, they focused, as do First Unum in their appeal decision, on the stress test in October 2014. But that's completely out of date because it's almost two years before the July 2014-2016 stress test, where Mr. Hinchey was so fatigued, they had to stop the stress test because he couldn't even reach the target weight. They stopped the treadmill. So that's why the HALO decision comes into play. So the decision by First Unum is all wrong. That's the whole key to the whole case. Do you follow? So Dr. McAllister's summary in August 2019 that took into account Dr. Tartaglia's July letter was insufficient from your view. He still did not take into account the most recent analysis of all these previous office visits where they say he was going to the gym 45 minutes a day. Well, if you go to the stress test in July 2016, he couldn't even achieve the target weight. So he's changed. His condition completely deteriorated. He's not going to the gym anymore. Things changed. That was a year ago. In July 2016, he completely deteriorated. This man no longer, he can't do a job anymore where he's got to go to the office and walk around as director of security. He can't do a job where he's got to walk around for several hours a day if he can't even walk on a treadmill. So that's the whole point. And under the HALO test, he can't do the job. Their decision is all wrong. So their issue is that he is disabled. They ignored, they went back to the stress test from October 2014 and they ignored the stress test from July 2016. I'm so glad we got to this oral argument so I could clarify this for you. Thank you. Sure. I appreciate it. That's it. All right. Well, you've preserved two minutes of rebuttal. Your time is just about to expire. We'll hear what your opposition has to say. Thank you. Sure. Mr. Begos. Thank you, Your Honor. May it please the court, Patrick Begos for the appellees in this matter. This is a classic case of a discretionary review under the arbitrary and capricious standard of an administrative claim determination. First unit paid the benefits at issue. I'm going to interrupt you right now at the beginning since we're just coming off a clarification from Mr. Hinchey's counsel. Could you point directly to anything that he said that was incorrect about the stress test timing and first units taking account of that? Sure. I think he's arguing that the failure to take account of that means that we have a procedural violation that you're just talking about. Sure. Yes, Your Honor. The short answer is Mr. Hinchey and his lawyer did not submit the 2016 stress test. What they submitted was a one page letter from a cardiologist that referred to the alleged results of the 2016 stress test. Mr. Hinchey's lawyer on administrative appeal. Remind me what the letter said. The letter said, let me just pull it up, Your Honor. With regard to the stress test, Dr. Tartaglia said Mr. Hinchey's fatigue was demonstrated on a recent nuclear stress test, which showed chronotropic incompetence, forcing the plaintiff to abort the test early in stage two of the Bruce protocol due to failure to achieve the target heart rate. The test was switched to a pharmacological study because of his failure to continue exercise. Why didn't that amount to submitting the results of the stress test? Because, Your Honor, Mr. Hinchey's attorney in May of 2016 had told First Unum that he had submitted Dr. Tartaglia's full and complete medical record. Then Dr. Tartaglia writes a letter in July which says, well, there was this stress test that occurred in May of 2016 that appeared nowhere in Dr. Tartaglia's actual record. What do you think? You think he falsified it? What what what are you trying to say? No, I'm not suggesting he falsified it. I think what's what's entirely possible is that it may have been some test ordered by some other doctor. And Mr. Hinchey was was reporting to Dr. Tartaglia. What happened in either event? Why would you think that from what you just read us? I think the doctor is saying that this test happened, that he demonstrated fatigue, that he had to abort the test early. What would make you think the doctor doesn't have knowledge of those facts? Because I think that had had he had the test results, the test results, the report would have been provided with his letter just as the actual report of the 2014 test was provided. The suggestion is that the failure to consider this, which would be at odds with the earlier. Evidence of ability to perform cert at a certain level was something that at least needed to be considered and addressed. Yes. And there's really two levels to this. Your Honor, there's the the halo question. What do the regulations require? And this first, you know, comply with the regulation and the regulation very specifically says that it's necessary to consider the information and documents that are submitted by the. You're implying to us that you didn't consider them because you had suspicions about whether this doctor's representations to you were bona fide. You've told us what entered your mind was, well, gee, why didn't he send this in earlier? But the letter you read contains specific findings of kind of a subpar performance on this test. Your Honor, I was responding specifically to a question about the stress test. I understood what you were saying. I appreciate your candor. I'm not suggesting that first, you know, concluded that there was a suspicion about what Dr. Tartaglia said in his letter. That's what you just that's what you just told us. Your Honor, what if I gave that impression, then I think I misspoke. What I'm suggesting is that first, you know, certainly considered Dr. Tartaglia's letter. Dr. McAllister specifically referenced the letter and discussed the letter and reached his conclusion. And first, you know, specifically addressed the letter in its appeal decision. The decision that first, you know, reached on appeal was based on far more than the question of either the 2014 stress test or the 2016 stress test. Are you saying that the consideration would have been different and maybe even a result would have been different had the actual stress test results been submitted rather than the summary provided in the brief letter at the end of July? Your Honor, I can't say what weight Dr. McAllister would have given to the results of the 2016 stress test if the test results themselves had been submitted. I can say that Dr. McAllister, Dr. Dodonna and Dr. Shepherd had based their evaluations on far more than simply a stress test. So may I ask a question about that with or without the stress test? You're relying on the DOT definition of the job, right? Yes, Your Honor. Okay. And in addition to talking about, you know, 20 pounds of force and all of that, which seemed to be everybody's focus, one of the things the definition says is you have to be able to remove or detain unruly persons. Now, I know we do deferential review, but is it really, does anybody really think that someone who's had a heart valve replacement is going to be able to remove or detain unruly persons? Your Honor, I believe that in the DOT definition, it's stated that that may be a requirement of the occupation. It may be. So that's now one of the things we have to consider. You don't want to consider the actual job. You want to consider this definition. And my concern is that nobody really addressed this. They were all talking about 20 pounds. Well, that's, you know, 20 pounds that's not resisting you. I'm concerned about whether we could reasonably think that any employer would hire someone who had to remove or detain unruly persons if they knew the applicant had had a heart valve replacement. Sure, Your Honor. I think there's a couple of levels of the response to that. First, as I mentioned, the definition, I believe I'm correct, says that that might be a requirement of the occupation, but not necessarily a requirement. Well, how does that play in? I mean, you're suggesting that therefore we wipe it out?  Your Honor, I'm saying that the vocational reviewer who did the evaluation concluded that that kind of physical requirement is not a material and substantial duty of the occupation. Having reviewed the DOT definition, as well as reviewing Mr. Henschey's description of his job, that was not challenged. What was that based on? That was based on his vocational experience and education, the expertise of the vocational reviewer. It was based on the information that Mr. Henschey had provided. It was based on the DOT information about the occupation. I will point out, Your Honor, that Mr. Henschey never raised the argument that you're raising now, either during the administrative review or during the case in the district court. The argument that Mr. Henschey had made in the district court was that First Unit had to base its determination on his job at Manhattanville. It included things like EMT work and crowd control. The argument that we'll accept the DOT definition, but we still think that Mr. Henschey couldn't perform those obligations, is something new that was raised on administrative appeal. I have to say that it wasn't directly addressed in the administrative review because Mr. Henschey didn't raise it as an argument. I do go back to, if you look at the vocational assessment that was done early on in the administration, the vocational reviewer did consider that information and I think did address the point that Your Honor raised here. Would you agree with me that this panel, this court, should just put out of our minds and give no consideration to the fact that First Unum has been what's described as a serial denier of these claims? If you do a LexisNexis search, I think your client appears as a denier more than anybody else that I've seen. I take it we should just put that out of our minds and it doesn't have any bearing on our decision. I think so for a couple of reasons, Your Honor. It was rejected by the district court as the district court considered it and didn't give weight to that argument. Plaintiff has abandoned it on appeal. They have not argued that a conflict of interest or bias should affect the determination. I would note that in the cases, the more recent cases in the last 10 or 15 years, certainly after First Unum was criticized by this court in the McCauley decision about 15 years ago, and there was a regulatory settlement agreement where First Unum revamped its claim procedures. There are decisions since then. I believe the Daniel decision is one of them from the Eastern District of New York. It noted that since McCauley, courts in this circuit have routinely affirmed First Unum's claim determination. I think to the extent there was criticism of First Unum in the past, I think the more recent case law supports the reasonableness and the correctness of First Unum's decision. I would say I think First Unum is also affected by the fact that it's a very large disability insurer. It has a lot of policies. It has a lot of claimants. It has a lot of cases. Before your time, I know, is up, but I just want to clarify one thing. Before Judge Parker asked you the question, you were pointing out to us that someone in the review process had considered the argument that I put to you, that there was a problem with whether someone with a heart valve replacement could control unruly persons or remove them. I'm not sure I knew who you said did that and where we would find it in the record. Can you help me out? Certainly, Your Honor. What I referred to was the vocational assessment that was done by First Unum early on in the case. If you give me one second, I can find you the page site to that. That's on page 465 through 467 of the record. Thank you. I just wanted your help in finding that. Thank you. If I may, I understand I'm over time. Go ahead. We've peppered you with questions. Take a minute to wrap up. Thank you very much. I do just want to say that I think that the focus on the 2016 stress test, or Dr. Tartaglia's description of that in his letter, eliminates discussion of all the other evidence that First Unum considered in this case. The doctors reviewed the medical records from Dr. Tartaglia, which consistently showed improvement in Mr. Henschey's functional capacity. Those records show that... The stress test was important, wouldn't you agree? Your Honor, I would agree that the stress test is... I mean, certainly First Unum considered the 2014 stress test. Right. So the more up-to-date one was important as well, wasn't it? Your Honor, I do believe that if Mr. Henschey wanted First Unum to give serious weight to a 2016 stress test, that he should have provided the report of the stress test. And so you've been falling back on your position that the doctor's letter was inadequate and somehow, what, evasive? No, Your Honor, what I'm saying, and I probably have not said it well here... Correct. That is correct. There is the regulatory issue, which is First Unum absolutely considered the letter which was submitted on administrative appeal, which I think addresses the standard of review. Then you have the question, was it reasonable for First Unum to reach the decision that it reached? And did it have substantial evidence for that decision? Notwithstanding Dr. Tartaglia's letter. And Dr. Tartaglia said what he said, and First Unum gave it the weight that it gave it. And under clear law from the Supreme Court and from this court, a claim administrator is not required to give dispositive weight to the opinion or evidence from a treating physician. So First Unum weighed the evidence, including Dr. Tartaglia's letter, and reached its determination. And I think that its determination... The February and March statements by Dr. Shepard and Nurse Ainscough, and conditions that have applied previously, that that somehow negates that there had been potentially a severe deterioration in Mr. Hinchey's health in July at the time of the stress test. Isn't that a plausible narrative that isn't really taken into account by Dr. McAllister's assessment? Well, it could be a plausible narrative. I think that Dr. McAllister did take the totality of the evidence into account and reached a conclusion that apparently is different than perhaps the panel would have reached. I would note that the last office visit note that was provided for Dr. Tartaglia was from January 2016, which reported on a normal halter monitor study. There's no evidence that Mr. Hinchey saw Dr. Tartaglia after January 2016. So to the extent there was a deterioration in his condition after that, the only evidence that there is in the record is Dr. Tartaglia's letter from July that talks about the stress test. There's no office visit notes from January to July 2016. There's nothing in the record other than Dr. Tartaglia's letter. Thank you. Thank you very much. We'll hear rebuttal. Mr. Hersenson. Actually, Mr. Hersenson, I'd like to ask you, why isn't it enough for Dr. McAllister to have reviewed and commented on your letter of July 27th when there was no actual stress test report attached to your letter? And Dr. Tartaglia had not seen Mr. Hinchey in the preceding months. Why isn't that sufficient to put First Unum in compliance with the regulations such that abuse of discretion review is appropriate? Well, his letter was before the appeal decision. The regulation requires that the appeal decision take into account any other information submitted by the claimant. Information does not require test results. There was a letter, and as your honors pointed out, that doesn't require test results. A letter from Dr. Tartaglia is not a fabrication. He's not going to write a letter making up a test result. All right.  Sure. Thank you. Thank you. Thank you both. We'll take the matter under advisement.